IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2016

## JERMAINE BURDETTE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-04800      James M. Lammey, Jr., Judge**

_____

**No. W2015-02400-CCA-R3-PC – Filed February 17, 2017**

_____

In 2011, the Petitioner, Jermaine Burdette, entered a best interest plea to three counts of especially aggravated kidnapping and three counts of aggravated robbery, and the trial court sentenced him to 111 years of incarceration. This Court affirmed his conviction and sentences on direct appeal. *State v. Jermaine Burdette*, No. W2011-01938-CCA-R3-CD, 2012 WL 6726525, at *1 (Tenn. Crim. App., at Jackson, Dec. 26, 2012), *perm. app. denied* (Tenn. May 9, 2013). In 2014, the Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel, that his plea was unknowingly and involuntarily entered, and that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing disclose exculpatory evidence until the day before trial. After a hearing, the post-conviction court denied relief. We affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Ryan C. Smith, Signal Mountain, Tennessee, for the appellant, Jermaine Burdette.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tyler B. Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Procedural History

This case arises from a home invasion, resulting in a robbery and kidnapping of three victims in Memphis, Tennessee. For this offense, a Shelby County grand jury

indicted the Petitioner for three counts of especially aggravated kidnapping and three counts of aggravated robbery.

## A. Guilty Plea

At the April 12, 2011 guilty plea hearing, the Petitioner's counsel advised the trial court that the State had arguably committed a *Brady* violation by withholding evidence until the day before trial. Based upon the statements of trial counsel, the trial court briefly considered the possibility of a *Brady* violation and determined that "It doesn't appear on its face really to be *Brady*." The State then recited the following facts which would have been presented had the case proceeded to trial:

[T]he State submits the proof would have shown [that on] December 31st of 2008, Dee Warrack was starting her car in the driveway when two unknown suspects armed with handguns forced her back into her home at 1715 Graceland Cove.

Dee Warrack, Kala Jones, and [J.G.] were all in the house at the time. [Dee Warrack] was bound with duct tape on her hands, her feet[,] and her mouth as the two men demanded money and valuables. They went and woke up Kala Jones and took her out of the bed, asking for money and hitting her in the head a number of times with the handgun.

One of the men went into the kitchen, got out a pot of water[,] and boiled water in the kitchen while they were demanding money and ransacking the house. [J.G.], [Dee Warrack's] 14-year-old son[,] awoke and was taken into the living room as well.

They did take Kala Jones and [J.G.] back into a bedroom to get money from [J.G.], his Christmas money of $95. At that time[,] one of the men became upset that that was all the money that [J.G.] had [and] started pouring the boiling water on Kala Jones, on her back, her buttocks and her thighs.

At the time when that was going on, Dee Warrack was allowed to be alone in the living room for a time while they were ransacking the bedroom and the others were in the back room. At that point[,] Dee Warrack was able to get out of the duct tape and did leave the house, driving away in her car, getting police and bringing police back to the scene.

The two men left with cash taken from Kala Jones in the amount of

about 800 or more dollars, jewelry from Kala Jones, jewelry and a cell phone from Dee Warrack and money, $95 from [J.G.].

The two men left. A witness observed one of them as they were leaving, headed toward the interstate. They pointed a gun at one of the police officers. The police officer shot, [and] the two men got away. They split up as they were leaving. Items were left inside the home. Items were left outside on a neighboring street. Those items were all recovered by police.

Inside of the home specifically was recovered the duct tape, which was processed. . . . The only prints found on it were matched to that of [the Petitioner].

Also items included the pot, which was in the bedroom where the water had been poured on Kala Jones. No prints were recovered from the pot.

Items also included a ski mask, which was found in the living room where a lot of this had taken place. That ski mask was processed by [the Tennessee Bureau of Investigation,] and the DNA saliva sweat was matched to that of [the Petitioner], [exceeding the] world population.

. . . [P]hoto spreads were shown to Kala Jones and Dee Warrack. They were not able to identify [the Petitioner]. The neighbor Mr. Elvis Kelly did indicate that he would be able to identify the person. He was never shown a photo spread.

Initially anticipated was that [the Petitioner] might put an alibi witness on the stand in trial. We did obtain a statement from her. She claimed the reason she remembered where he was, was because [Memphis Light Gas and Water ("MLGW")] had an outage that day at their apartment where he reportedly was staying. We have confirmed with MLGW[,] and they were anticipated to be rebuttal proof that there was no outage at the home on the day in question.

Those would have been the facts had the matter gone to trial. Ms. Kala Jones was taken to the hospital for multiple burns, second or third degree, . . . and did have to undergo medical treatment for quite some time.

Those would have essentially been the facts had the matter gone to

3

trial with one exception.  There was a gun also recovered at a later time[,] not found by the police at the time[,] that was [turned] over to the police.  It was recovered under the couch in the living room where all of this happened[,] and it was loaded with one cocked, ready to go.

*Burdette*, 2012 WL 6726525, at *1-2.

The trial court informed the Petitioner that he would be sentenced as a Range I offender with a sentencing range of fifteen to twenty-five years for the especially aggravated kidnapping convictions and eight to twelve years for the aggravated robbery convictions.

During the plea colloquy, the Petitioner's attorney ("Counsel") questioned the Petitioner about his decision to plead guilty.  The Petitioner indicated that he and Counsel had been discussing the case for two years, including discussing the evidence, particularly the DNA evidence.  The Petitioner agreed that Counsel had conveyed to him the State's offer but that he had chosen to go to trial.  The Petitioner agreed that Counsel later explained to him what "pleading guilty open" meant and that he understood that his sentence would be decided by the trial court.  The Petitioner agreed that Counsel had not promised him a certain sentence length and that he was pleading guilty because of the weight of the evidence against him.  The Petitioner stated that because of the evidence, he felt it was in his "best interest" to plead guilty.  The Petitioner agreed that he had discussed the decision with Counsel and several other attorneys and that the trial strategy had been part of their discussions.  The Petitioner stated that he understood what the defense theory was going to be at trial but that he wished to plead guilty instead of going to trial.  The trial court asked the Petitioner if he understood his rights and his possible sentence and if he wished to plead guilty, to which the Petitioner replied that he did and affirmed that he was entering his plea knowingly and voluntarily.  The Petitioner stated that he had pleaded guilty in the past and that he had discussed his potential sentence, including the possibility of consecutive sentencing, with Counsel.

At the subsequent sentencing hearing, the trial court sentenced the Petitioner to an effective sentence of 111 years to be served at 100% in the Tennessee Department of Correction.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief, *pro se*.  The post-conviction court appointed an attorney, and the attorney filed an amended petition, in which the Petitioner alleged that he had received the ineffective assistance of counsel, that his guilty plea was not knowingly and voluntarily entered, and that the State had

4

committed a *Brady* violation.

The post-conviction court subsequently held a hearing during which the following evidence was presented: the Petitioner testified that he was represented by multiple attorneys throughout the proceedings, all members of the same law firm. He was represented by Counsel following his bond hearing until his guilty plea hearing. The Petitioner met with Counsel approximately fifteen times outside of court. Following the guilty plea hearing, the Petitioner was represented by a different attorney, ("Sentencing Counsel"), and he met with Sentencing Counsel between five and ten times outside of court. The Petitioner stated that neither of his attorneys explained to him the elements of the charges or the factors that would be considered at sentencing. He stated that he was never advised that, if his case had proceeded to trial, his attorney could have "challenged" the kidnapping charges by arguing that they were incidental to the robbery charges.

The Petitioner recalled that Counsel informed him several days before his trial date that "another suspect" had been located but that Counsel did not adjust his strategy or propose any other defenses in light of the new information. The Petitioner stated that the State made two offers, fifteen years and thirteen and a half years, and that Counsel told him not to accept the offers. At the sentencing hearing, a police officer identified the Petitioner and testified that the Petitioner pointed a gun at him, and Sentencing Counsel argued to the trial court that this fact was not previously known to her or the Petitioner. The Petitioner testified that, had he known about the officer's testimony, he would have accepted the State's offer of thirteen and a half years. The Petitioner further testified that Counsel never informed him that he was "giving up" his rights by entering a plea.

On cross-examination, the Petitioner stated that Counsel had reviewed his trial strategy with the Petitioner but that the Petitioner did not understand it. He maintained that he had answered all of the questions during the plea colloquy based on the advice of Counsel and that his decision to enter the plea was similarly based on the advice of Counsel and not of his own free will. The Petitioner agreed that Counsel had reviewed with him the maximum possible sentence he might receive, and that he accepted Counsel's advice to enter an *Alford* plea because he was under the assumption that the trial court would impose a lower sentence than if he proceeded to trial. He agreed that he had filed a post-conviction petition because the sentence imposed by the trial court was so lengthy.

On redirect-examination, the Petitioner stated that Counsel did not provide him an alternative course of action to entering a plea and did not go over a trial strategy with him. The Petitioner stated that he did not understand the trial process or the criminal procedure involved with pleading guilty versus proceeding to trial.

5

The post-conviction court questioned the Petitioner, and the Petitioner agreed that he had pleaded guilty to criminal charges prior to the guilty plea in this case.

Sentencing Counsel testified that she had been practicing for two years when she represented the Petitioner and that his was her first sentencing hearing. With regard to the police officer's testimony at the sentencing hearing, Sentencing Counsel argued that the testimony was not included in discovery provided by the State and was not known to Sentencing Counsel or the Petitioner before the hearing. Sentencing Counsel advised that Counsel had moved out of the state after he represented the Petitioner. Sentencing Counsel stated that she was not involved in the plea negotiations with the State or in Counsel's discussions with the Petitioner. Sentencing Counsel recalled that the State's plea offer of thirteen-and-a-half years was rescinded once the results of the DNA testing became known. Counsel discussed with her that he thought the Petitioner would be sentenced to twenty-five years if he entered a plea.

On cross-examination, Sentencing Counsel stated that Counsel had been practicing for three years before he represented the Petitioner and that he was a qualified attorney. The trial court questioned Sentencing Counsel about the factors that led to the Petitioner entering a plea, and Sentencing Counsel stated that she understood that Counsel had advised the Petitioner to enter a plea because the Petitioner's DNA and fingerprints were identified. She agreed with the trial court that it was "pretty much a given" that the Petitioner would be convicted by a jury. She also agreed that the police officer's testimony at the sentencing hearing might have made it more likely that the Petitioner would have entered a plea and not more likely that he would have proceeded to trial. Sentencing Counsel clarified that the police officer who testified was flagged down by one of the victims after she escaped the scene of the robbery.

Upon further questioning by the post-conviction court, Sentencing Counsel stated that she did not know whether Counsel had tried to interview the police officer who testified at the sentencing hearing.

Stacey McEndree testified that she was the lead prosecutor on the Petitioner's case and that she negotiated with Counsel throughout the period leading up to the trial date. The State made an offer of a fifteen-year sentence to the Petitioner and subsequently made another offer of thirteen and a half years. The Petitioner rejected those offers and the case was set for trial. Counsel attempted to renegotiate an offer up until the trial date. Ms. McEndree stated that there was no report detailing the officer's testimony, so it was not included in discovery, and it was not until the day of trial that the officer's eyewitness information "came to light." Ms. McEndree stated that Counsel "did everything in his power" to get an offer for the Petitioner that he was willing to accept. Ms. McEndree reiterated that the proof against the Petitioner was overwhelming and there was not a

"decent defense strategy" that could weaken the State's case against the Petitioner.

Ms. McEndree testified that the egregious facts of the restraint of the victims, including duct taping them and holding them against their will for forty-five minutes, made it clear that the kidnapping was not incidental to the robbery and that Counsel could not have successfully argued otherwise.

The post-conviction court questioned Ms. McEndree, and she testified that the identity of the man with the Petitioner during the commission of the crime was discussed but that the Petitioner never would identify him. Ms. McEndree recalled that the Petitioner refused to take any responsibility for the crime and insisted throughout plea negotiations that he was not involved despite his DNA and fingerprints being present at the scene.

At the conclusion of the hearing, the post-conviction court denied the Petitioner's petition, stating that neither Counsel nor Sentencing Counsel had provided ineffective assistance. The post-conviction court stated that the trial court gave the Petitioner the opportunity to take responsibility for his involvement in the crime and instead the Petitioner denied any involvement despite the overwhelming physical proof placing him at the scene. This, the post-conviction court stated, led to the Petitioner receiving the maximum sentence. The post-conviction court stated that Counsel had given his best effort to get a plea offer for the Petitioner. The post-conviction court also found that Sentencing Counsel had given her best effort to get a lesser sentence for the Petitioner but that the Petitioner's failure to take responsibility for the crime ultimately led to him receiving a greater sentence. The post-conviction court stated that the Petitioner knew that a jury would find him guilty, which was what led him to enter a plea, and that his subsequent failure to take responsibility for his actions at sentencing was what led him to receive the maximum sentence, which he later regretted. This, the post-conviction court stated, could not be blamed on Counsel's performance but on the Petitioner's choices.

The post-conviction court subsequently issued an order adopting that which it had stated in open court, and stating that the Petitioner "failed to prove ineffective assistance of counsel. More specially, he has failed to carry his burden of proof as to either deficient performance or prejudice. Furthermore, the court finds that [the] [P]etitioner was less than candid with the court. [The] Petitioner's testimony was simply incredulous."

It is from the post-conviction court's judgment that the Petitioner now appeals.

**II. Analysis**

On appeal, the Petitioner contends that he had received the ineffective assistance of counsel, that his plea was unknowingly and involuntarily entered, and that the State violated *Brady v. Maryland* by failing to disclose exculpatory evidence until the day before trial. The State responds that the record shows that his plea was voluntarily entered and that Counsel's and Sentencing Counsel's representation of the Petitioner was effective. The State further responds that there was no *Brady* violation committed. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving the factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

## A. Ineffective Assistance of Counsel and Guilty Plea

Specifically, the Petitioner argues that Counsel was ineffective because he did not fully explain to him the applicable sentencing range and never explained to him the charges he was facing. He also alleges that Counsel did not properly advise him that the kidnapping was arguably incidental to the robbery, which would have affected his decision to plead guilty. He further contends that Counsel was not prepared with a course of action for trial and advised him to plead guilty without properly explaining the charges and the sentence and that, but for Counsel's advice, the Petitioner would have accepted one of the State's plea offers. Thus, the Petitioner contends that his plea was not knowingly and voluntarily entered.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient.

8

> This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

9

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

This standard also applies to claims arising out of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). To satisfy the requirement of prejudice in a case involving a guilty plea, the petitioner must demonstrate a reasonable probability that, but for counsel's errors, he or she "would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). A petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The post-conviction court found that the Petitioner was not credible and that it was the Petitioner's decision to plead guilty. It further found that the Petitioner received the maximum sentence because he failed to take responsibility for the crime. This, the post-conviction court found, could not be blamed on Counsel's ineffectiveness but on the Petitioner's choices. In our view, the testimony and evidence support the post-conviction court's determinations. At the guilty plea hearing the Petitioner stated that he understood his possible sentence and that the trial court would be determining his sentence. Although the Petitioner testified at the post-conviction hearing that he did not understand the process of pleading guilty versus going to trial, he agreed that he had pleaded guilty to crimes in the past. The Petitioner testified that he chose to plead guilty based on Counsel's advice, but the post-conviction court found that the Petitioner's testimony was not credible.

10

Sentencing Counsel testified that Counsel was a qualified attorney and had done "everything in his power" to negotiate an acceptable plea bargain; it was, she stated, "a given" that the Petitioner would be convicted by a jury because of the "overwhelming proof." Based on these facts, we conclude that the post-conviction court properly determined that the Petitioner had received the effective assistance of counsel.

The Petitioner argues that Counsel was ineffective for failing to explain to the Petitioner that the kidnapping could have been incidental to the robbery and that such an argument could have been submitted to the jury. The State responds that this standard, announced in *State v. White*, 362 S.W.3d 559 (stating that jury instructions must include a determination as to whether a victim's "removal or confinement" is essentially "incidental" to the accompanying offense of aggravated robbery), was not adopted until after the Petitioner pleaded guilty. The State further argues the kidnappings in this case "far exceeded 'that which was necessary to accomplish the accompanying felony'" of aggravated robbery. The State argues that the Petitioner's conduct: binding his victims, beating them, and pouring boiling water on one victim to intimidate the other, was not "incidental" conduct. We agree with the State and conclude that Counsel was not ineffective for failing to explain this nuance of the law to the Petitioner.

We also conclude that the Petitioner has not shown that his plea was entered unknowingly or involuntarily. The post-conviction court, which also served as the trial court, recalled that at the plea colloquy the Petitioner affirmed his understanding of his rights and what rights he was forgoing by choosing to plead guilty. The Petitioner contends that Counsel did not explain to him the sentence he might receive or give a full explanation about the charges he was facing, however, at the guilty plea hearing the Petitioner testified that Counsel had, in fact, gone over the charges, the evidence against him, the trial strategy, and his possible sentence. Furthermore, the trial court reviewed all of those aspects of the plea with the Petitioner at the guilty plea hearing. The Petitioner expressed his understanding of the implications of his decision to plead guilty and affirmed that he did not wish to proceed to trial. We agree with the post-conviction court that the Petitioner has not provided any credible evidence that his plea was not knowingly and voluntarily entered.

## B. *Brady* Violation

The Petitioner lastly contends that the State withheld evidence, specifically the identification made of him at the sentencing hearing by the police officer, in violation of *Brady v. Maryland*. The State responds that no *Brady* violation occurred because the evidence was not exculpatory, and the State did not suppress the evidence. We agree with the State.

In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Id.* at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Id.* at 56 (quoting *Strickler v. Green*, 527 U.S. 263, (1999)). Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (quoting *Johnson*, 38 S.W.3d at 56).

The State does not have an obligation to disclose information that is not in the possession or control of the State. *Id.* (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)). A defendant must prove the following four prerequisites in order to establish a violation of due process under *Brady*:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove a due process violation by a preponderance of the evidence. *Id.* (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

> The Tennessee Supreme Court defined "material" within the context of *Brady*: Evidence is deemed to be material when "there is a reasonable

12

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." . . . [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted).

In the present case, the prosecutor testified that the information the Petitioner contends was withheld did not come to light until the day of trial. She also stated that the information was not contained in any written report or it would have been included in discovery. Furthermore, the evidence is not in any way favorable to the Petitioner. The police officer testified at the sentencing hearing that the Petitioner pointed a gun at him just after the robbery and kidnapping occurred. The Petitioner has failed to show the prerequisites for a *Brady* violation and thus, he is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

13